## PAINE, WEBBER & COMPANY *v.* ARKANSAS & ARIZONA COPPER COMPANY.

### Opinion delivered November 11, 1918.

1. CORPORATIONS—STOLEN STOCK—LIABILITY.—Where a corporation intrusted certain of its stock to an employee for cancellation after new stock had been issued in its place, the corporation must respond in damages to an innocent purchaser thereof.

2. SAME — STOLEN STOCK — INNOCENT PURCHASER. — Plaintiffs purchased stolen corporate stock from a stranger whose name did not appear on the stock, who was apparently transacting business from a room in a hotel, instead of a regular place of business, who was willing to take a price materially less than the market price for the stock, and who insisted upon immediate collection and remittance; it was the general custom of brokers dealing with this stock to require a guaranty of the seller or to require him to identify himself as the owner, but this custom was not followed by plaintiffs. *Held* that plaintiffs were not innocent purchasers.

Appeal from Pulaski Circuit Court, Third Division; *G. W. Hendricks,* Judge; affirmed.

*Rose, Hemingway, Cantrell, Loughborough & Miles, Edw. B. Downie* and *Jno. P. Streepey,* for appellant.

1. The appellant was entitled to recover upon the familiar rule that where one of two innocent persons through negligence, carelessness or misplaced trust makes it possible for the injury to occur he must suffer the consequences. Appellee intrusted certificates of stock to a young clerk in its office, sent in for reissue and endorsed in blank. He had access to the stock and was intrusted with its custody and defendant knew it had placed in his hands means to deceive the public. 60 N. E. 983.

2. While stock certificates are not negotiable strictly, yet they are quasi-negotiable and become the basis of commercial transactions and are sold in the open market like other securities, etc. 11 Wallace 369; 60 N. E. 983-4. As to the distinction between larceny and embezzlement see 62 N. E. 751.

3. Appellee is estopped by its conduct in placing the means to deceive in the hands of its trusted employee. 57 U. S. Law, Ed. 1241-1247.

*Cockrill & Armistead,* for appellee.

1. Plaintiffs were guilty of contributory negligence. The stock was not negotiable and one employing another in a position of trust or confidence is not bound to assume that he will be dishonest, and is not negligent in trusting property to his custody and is not bound to anticipate dishonesty. 168 Mass. 573; 66 Oh. St. 367; 117 Minn. 124. The purchaser must exercise due care. 148. N. Y. 441. Appellants should have made due inquiry.

2. Notice of the embezzlement was given the appellee promptly. The stock was not negotiable. 100 Mass. 382; 117 Minn. 124; Rev. St. of Arizona 1913, § 2106. No proper inquiry was made of the corporation or its officers, but they bought the stock at their own risk because it was cheap. Appellee promptly gave notice as soon as it discovered the theft.

The appellants in reply cite 93 Fed. 603; 67 L. R. A. 671 and 672 note.

Humphreys, J. Appellants, Paine, Webber & Company, instituted suit against appellee, Arkansas & Arizona Copper Company, on the 6th day of November, 1916, in the Third Division of the Pulaski Circuit Court, to recover damages for the sum of $2,537.38, incurred through the sale of six thousand shares of corporate stock of said appellee company. It was alleged in the complaint that appellee negligently failed to cancel a certificate for 1,000 shares, No. A-6646, and a certificate for 5,000 shares, No. A-6615, which had been indorsed in blank by the owner and returned to appellee company for cancellation; that the uncanceled certificates were accessible to every one in the office, including George T. Sloan, an employee; that said Sloan embezzled the certificates and sent them, for sale, on the 15th day of July, 1916, to appellants, who were stock brokers in the city of Boston; that the certificates were clean and bore no marks of cancellation, and that appellants accepted them in good faith and sold 2,000 shares of said stock, for which they remitted $479.20 to Sloan; and that they contracted the sale of the balance

of said stock to purchasers under the rules of the Boston Stock Exchange, which made them personally liable for carrying out the contract; that, on account of the stock sent them being embezzled, they were compelled to replace the stock by purchase on the market at an advance of $2,058.18, making a total damage to them of $2,537.38.

Appellee filed answer, denying all the material allegations of the complaint, and, by way of further defense, pleaded that appellants were guilty of contributory negligence in acquiring the stock certificates from a stranger, who was not the registered holder thereof, without investigation and without demanding a transfer on the books of appellee.

The cause was tried before the circuit court sitting as a jury upon the pleadings and evidence adduced, from which the court found the issues for appellee and rendered judgment dismissing appellants' complaint. Proper steps were taken and an appeal duly prosecuted to this court from the finding and judgment of the court .

The evidence material to a decision of this case on appeal is, in substance, as follows:   Appellee company was an Arizona mining corporation doing business with its general office in the city of Little Rock.   It issued a large amount of stock for sale in the market.   A great deal of the stock was for sale at the time the certificates in question were embezzled by George T. Sloan.   Much of the stock sold was being returned to the company for reissue and transfer on the books.   Geo. T. Sloan was an employee of the company and was permitted to reissue the stock, present same to the president for his signature and the seal of the company, and to check said stock with the president and to cancel the old certificates upon the issuance of the new certificates replacing them.   Instead of canceling certificates No. A-6646 and A-6615 and filing them away, he embezzled them.   Afterwards, on the 15th day of July, 1916, he wired to appellants, under the assumed name of Harold Goldman, from Kansas City, Mo., to "quote Arkansas-Arizona copper and your selling charge immediately.   Telegraph collect."   On the same

day, he forwarded by letter the 6,000 shares of stock to appellants with instructions to sell it at the highest price available, but in no event for less than 24 cents per share net to him. On July 20, 1916, appellants sold 2,000 shares of the stock at 25 cents a share and remitted $479.20 to Harold Goldman. On July 24, 1916, Sloan again wired appellants under the assumed name of Harold Goldman, as follows: "If stock is not already sold, sell Monday at best price obtainable disregarding twenty-four cent limit of my instruction letter if necessary. Remit by exchange as previous. Advise by wire, collect, when sold. That mine does not look good to me." Appellants then sold 300 shares on July 25th, 500 shares on July 27th, and 3,200 shares on July 28th, in separate blocks of 100, 200, 1,000 and 1,900 shares. This completed the sale of 6,000 shares, all having been made before appellants received the written notice of date July 26, 1916, from appellee to the effect that the certificates in question, with other certificates, had been stolen from appellee. Appellants were compelled to buy stock at an advance of $2,058.18 to fill the contracts of sale on July 25th, 27th and 28th, aforesaid. Appellants were one of the biggest brokerage concerns in the country, members of leading exchanges and known as the leading copper share brokers in the United States. It was the custom of all careful brokers doing any volume of business to require identification of persons offering certificates of stock for sale. The certificate of stock for 5,000 shares was issued to W. B. Worthen Company and by it endorsed in blank; and the certificate for 1,000 shares was issued to A. L. Diebel and by him indorsed in blank at the time appellants received the certificates enclosed in the letter of date July 15, 1916, from Sloan under the assumed named of Harold Goldman. Harold Goldman's address was given as Room No. 816, Hotel Muehlback, Kansas City, Mo. Appellants accepted the stock and bound themselves personally upon the sales thereof without requiring identification of Harold Goldman. Some substantial evidence tended to show that the stock was sold by appellants under contracts binding them individ-

ually, ten or twelve cents less per share than it was selling for on the market.

It is conceded by appellants that, had the stock been stolen by Sloan, they could not have acquired any interest therein under the doctrine of innocent purchaser, but they contend that a different rule applies to stock embezzled through the negligence of the company issuing it. This contention is made upon the theory that corporate stock is negotiable, and that where one of two innocent persons must suffer the one through whose negligence the injury was wrought should bear the consequences. It can not be denied under this record that appellee put it within the power of Sloan, alias Harold Goldman, to embezzle the uncanceled stock in question. It intrusted the stock to him for cancellation and filing after new stock had been issued in its place. As between appellee and an innocent purchaser, appellee should perhaps respond in damages occasioned by a purchase of the stock, for this court is committed to the doctrine that corporate stock is in a measure negotiable. It was said by the court in the case of *Bankers Trust Company* v. *McCloy,* 109 Ark. 169: "Shares of stock in a corporation do not constitute negotiable paper within the law merchant, but in some of the authorities such instruments are spoken of as possessing elements of quasi-negotiability, and the modern authorities generally lay down the rule that necessities of business require that shares of stock should be treated *prima facie* as evidence of unencumbered ownership of the holder thereof named in the certificate and upon the books of the company."

In support of the declaration that corporate stock possessed elements of quasi-negotiability, the court cited *Driscoll* v. *Manufacturing Company,* 59 N. Y. 96; *Bank* v. *Lanier,* 11 Wallace, 369; Helliwell on Stock and Stockholders, p. 309. In the case of *Bank* v. *Lanier, supra,* it was said by Mr. Justice Davis, speaking for the Supreme Court of the United States, that: "Stock certificates of all kinds have been constructed in a way to invite the confidence of business men, so that they have become the

basis of commercial transactions in all the large cities of the country, and are sold in open market, the same as other securities. Although neither in form or character negotiable paper, they approximate to it as nearly as practicable. * * * Whoever in good faith buys the stock and produces to the corporation the certificates, regularly assigned, with power to transfer, is entitled to have the stock transferred to him."

In applying this rule to the instant case, the all important question to determine is, Did appellants acquire the stock in good faith? Are they protected under the doctrine of innocent purchaser? Appellee charged that they were guilty of contributory negligence. The court sitting as a jury so found. If there is any substantial evidence in the record, viewed in the most favorable light to appellee, to support the verdict, under the rule on appeal the judgment must stand. Appellants dealt with a stranger whose name did not appear on the stock. They had information that he occupied a room No. 816 in Hotel Muehlback, Kansas City, Missouri, and they demanded no reference nor made any inquiries concerning him. The fact that he was transacting business from a room in a hotel, instead of a regular place of business, would have been sufficient to put a real careful business man upon inquiry. The fact that he was willing to take ten or twelve cents less than the market price for the stock on a rising market ought to have aroused the curiosity of a prudent business man. The hurry tone of the messages, the insistance upon immediate collection and remittance in Kansas City exchange, the lifting of the twenty-four cent minimum price, with direction to sell in any event at the best price obtainable, if not sold by Monday, should have been regarded by a cautious business man as a little out of the ordinary. But, in addition to these suggestive circumstances, there is some positive evidence in the record touching upon the custom of brokers with reference to the sales of this stock. Mr. Boyle testified that it was the general custom of brokers dealing with this stock to require a guaranty of the party selling it, or to require the

party offering it for sale to identify himself as the owner thereof. Appellants did not follow the custom before acquiring the stock. From substantial evidence in the case, the court was warranted in finding that there was sufficient to put appellants upon inquiry. An inquiry would have developed that the stock had been embezzled.

The judgment is affirmed.

SMITH, J., dissents.